**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| RHONDA R. ALLEN, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CAROLYN W. COLVIN, Acting )<br>Commissioner of Social )<br>Security Administration, )<br>)<br>Defendant. ) | Case No. CIV-15-150-FHS-KEW |

**REPORT AND RECOMMENDATION**

Plaintiff Rhonda R. Allen (the "Claimant") requests judicial review of the decision of the Commissioner of the Social Security Administration (the "Commissioner") denying Claimant's application for disability benefits under the Social Security Act. Claimant appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Claimant was not disabled. For the reasons discussed below, it is the recommendation of the undersigned that the Commissioner's decision be REVERSED and REMANDED for further proceedings.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . ." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social

Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . ." 42 U.S.C. §423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. *See*, 20 C.F.R. §§ 404.1520, 416.920.[1]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal

---

[1] Step one requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.910. Step two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. 20 C.F.R. §§ 404.1521, 416.921. If the claimant is engaged in substantial gainful activity (step one) or if the claimant's impairment is not medically severe (step two), disability benefits are denied. At step three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to step four, where claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's step four burden is met, the burden shifts to the Commissioner to establish at step five that work exists in significant numbers in the national economy which the claimant – taking into account his age, education, work experience, and RFC – can perform. Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. *See generally,* Williams v. Bowen, 844 F.2d 748, 750-51 (10th Cir. 1988).

standards were applied. <u>Hawkins v. Chater</u>, 113 F.3d 1162, 1164 (10th Cir. 1997)(citation omitted). The term "substantial evidence" has been interpreted by the United States Supreme Court to require "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). The court may not re-weigh the evidence nor substitute its discretion for that of the agency. <u>Casias v. Secretary of Health & Human Servs.</u>, 933 F.2d 799, 800 (10th Cir. 1991). Nevertheless, the court must review the record as a whole, and the "substantiality of the evidence must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951); *see also*, <u>Casias</u>, 933 F.2d at 800-01.

**Claimant's Background**

Claimant was born on July 18, 1970 and was 43 years old at the time of the ALJ's decision. Claimant is a college graduate studying radiology technology. Claimant has worked in the past as a radiology technician. Claimant alleges an inability to work beginning December 14, 2006 due to limitations resulting from depression, anxiety, concentration problems, and panic attacks.

**Procedural History**

On August 27, 2009, Claimant was awarded disability insurance benefits under Title II (42 U.S.C. § 401, *et seq.*) of the Social Security Act, finding Claimant was disabled as of December 14, 2006. On February 13, 2012, the agency determined Claimant was no longer disabled as of November 2, 2011. In so doing, the agency found that Claimant had not cooperated, returned requested forms, or responded to attempts to contact her. (Tr. 86-87).

On October 22, 2013, a video hearing was held by Administrative Law Judge ("ALJ") James Bentley with the ALJ presiding in McAlester, Oklahoma and Claimant appearing in Poteau, Oklahoma. On November 1, 2013, the ALJ issued an unfavorable decision, finding Claimant was no longer disabled. The Appeals Council denied review on March 26, 2015. As a result, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

**Decision of the Administrative Law Judge**

The ALJ made his decision at step five of the sequential evaluation. He determined that while Claimant suffered from severe impairments, she had experienced medical improvement and retained the RFC beginning on November 2, 2011 to perform light work with limitations.

**Error Alleged for Review**

Claimant asserts the ALJ committed error in (1) finding Claimant experienced medical improvement but if there has been medical improvement, it was not related to Claimant's ability to work; and (2) finding that there were other jobs that Claimant could perform.

**Evidence of Medical Improvement**

By decision dated August 27, 2009, Claimant was awarded benefits under Title II based upon a finding of disability beginning on December 14, 2006. (Tr. 340). At that time, the assigned ALJ found Claimant suffered from the severe impairments of cervical degenerative disc disease, anxiety, major depression, attention deficit disorder. (Tr. 335). The ALJ found Claimant retained the RFC to perform light work except for no sustained driving; only occasional reaching overhead; only non-complex simple instructions; little judgment; routine repetitive work where she must be able to learn by rote with few variables; only superficial contact incidental to work with the public or co-workers; supervision must have been concrete, direct and specific; due to combined impairments/symptoms and pain, fatigue, and side effects of medications and lack of restorative sleeps, Claimant would need unscheduled breaks; Claimant would be absent from work more than

two times a month and could not sustain a competitive pace one-third of the day. (Tr. 337). The ALJ found Claimant's RFC did not permit her to perform her past relevant work or any jobs in the economy. (Tr. 338, 340). Upon finding Claimant disabled, the ALJ included a statement in her decision that "[m]edical improvement is expected with appropriate treatment. Consequently, a continuing disability review is recommended in 12 months." (Tr. 340).

In the November 1, 2013 decision, the ALJ maintained the findings of severe impairments from the first decision of attention deficit disorder; generalized anxiety disorder; depressive disorder; and cervical degenerative disc disease. (Tr. 12). The ALJ, however, found that the severity of these impairments had decreased to the point where Claimant had the RFC to lift/carry twenty pounds occasionally and ten pounds frequently; to stand/walk for six hours total during an eight hour workday; and to sit for six hours total during an eight hour workday. Due to psychologically based factors, Claimant was found to be capable of performing simple tasks with routine supervision; she could have occasional contact with co-workers and supervisors and no contact with the public. (Tr. 15-16).

In an initial evaluation on December 28, 2006, Dr. Donald Chambers diagnosed Claimant with mixed bipolar/attention deficit

6

disorder problems. (Tr. 251). Since Claimant was found to be disabled until November 2, 2011, this Court will examine the treatment record immediately prior to this time to ascertain whether substantial evidence existed for the ALJ to determine Claimant had made medical improvement to permit her to engage in basic work activities.

On January 6, 2010, Dr. Chambers found Claimant was doing better since ending a relationship with a convicted felon boyfriend. She was prescribed Adderall and Valium and hoped to do more neurofeedback, noting that Claimant did well with this program before. (Tr. 214).

On August 18, 2010, Claimant was seen by Dr. William Willis for a medication refill. She reported some problems with fatigue and sought blood work. Dr. Willis declined to change any of Claimant's medications prescribed by Dr. Chambers but noted that her pain medicines and attention deficit disorder medication "seem to be relatively high dosages." (Tr. 203).

On December 21, 2010, Dr. Chambers attended Claimant, stating he had not seen her in a year. He took her off of Adderall and put her back on Daytrona. (Tr. 216).

On March 24, 2011, Dr. Chambers noted Claimant was now getting help from Medicare and was "looking to expand treatment a little

bit." Dr. Chambers altered Claimant's medication, finding her ADD was a major disorder. (Tr. 218).

On July 27, 2011, Claimant was seen by Dr. Willis for a three month checkup. With regard to her medication, the treatment notes indicate Claimant's prescriptions were not due until August 6. Dr. Willis acknowledged Claimant's problems included chronic pain and ADHD. (Tr. 202).

On September 13, 2011, Claimant reported to Dr. Chambers that the Ritalin and Daytrona allowed her to focus and get some things done but that she could not do so without the medication. Claimant expressed that she would like to do more neurofeedback but that logistics and cost made it difficult. Dr. Chambers also found Claimant to have chronic back and neck pain. She also could not get along with anybody, could not keep a boyfriend more than a year, experienced a "racing mind," had a high level of frustration, worried constantly, and angers easily. Dr. Chambers stated he believed neurofeedback would be the best option and set another appointment in three months. (Tr. 221).

On November 3, 2011, Dr. Chambers completed a Treating Physician Mental Functional Assessment Questionnaire with regard to Claimant's condition. He identified Claimant's psychiatric diagnosis as generalized anxiety and depression as well as adult

8

ADD. The diagnosis was based upon findings of chronic anxiety, chronic worry, fearfulness, poor concentration, and racing mind. Dr. Chambers stated that Claimant's mental problems impose more than minimal limitations, including difficulty engaging in tasks, poor mental organization, a racing mind, scattered thoughts, and a loss of confidence. (Tr. 206).

On January 16, 2012, Plaintiff was seen by Dr. Willis for a medication refill. Dr. Willis expressed continuing concern about the quantity and dosage of the psychotropic and psychiatric medications prescribed by Dr. Chambers and insisted that Claimant obtain these drugs from Dr. Chambers. He agreed to fill the prescriptions on the one occasion. (Tr. 212).

On March 5, 2012, Dr. Chambers recorded that Claimant's ex-husband had not forwarded mail to her from the Social Security Administration and, as a result, her disability benefits had been discontinued. He stated that this had "thrown her for a loop" but had considered returning to work to regain her license as an x-ray technician. She continued on her medications. (Tr. 305).

On July 26, 2012, Claimant reported to Dr. Chambers that she had been off all of her medications for a couple of months which made "a major difference." She was riding with her son on his work trips because he did not want to leave her alone. She was

9

depressed and Dr. Chambers was prescribing Zoloft. She was found to have a serious attentional problem. (Tr. 308).

On September 17, 2012, Claimant told Dr. Chambers that she was "just kine of flat and listless, not motivated, not interested and she just wants to sit around." She experienced difficulty sleeping, even on Ambien. It took her the whole day to get herself organized and to Dr. Chambers' office. Dr. Chambers altered Claimant's medication regimen. (Tr. 311).

On November 20, 2013, Claimant reported to Dr. Chambers that she had been drinking and gambling. She lost $4,000.00. She also related an incident wherein she wanted to kill a woman at Wal-Mart. Dr. Chambers stated she could get "super mad" and that she carries a knife after being abused by two previous boyfriends. She also had an encounter with the police. Dr. Chambers altered her medication again. (Tr. 322).

On April 8, 2013, Claimant stated she had been out of her medication for two months and was worse. Her ADD symptoms were worse, she was not sleeping, and she was very depressed. Dr. Chambers prescribed Viibryd, Adderall, and Ambien. (Tr. 315).

On June 5, 2013, Claimant was attended by Dr. Chambers and was very depressed. She was going to see a therapist and begin neurofeedback. Dr. Chambers stated Claimant had previously had

10

good results with neurofeedback but that she was going to need periodic maintenance episodes. She felt she had lost everything, she was alienated from one son but the other looks out for her. She stated she got mad, she was "off the wall", and she cried. Her emotions were "just swinging and out of control." Anticonvulsant stabilizer medications were not beneficial. She had been off all medications for a month or more. Dr. Chambers prescribed Valium and Ambien. (Tr. 314). On July 3, 2013, Dr. Chambers again noted that Claimant needed to restart neurofeedback. Claimant reported feeling "some better than last time." She remained on Valium, Ambien, and Adderall. (Tr. 328).

On October 12, 2012, Dr. Chambers authored a Mental Medical Source Statement on Claimant. He found Claimant was markedly limited in the functional areas of the ability to maintain attention and concentration for extended periods and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. He determined Claimant had moderate limitations in the areas of the ability to carry out detailed instructions; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to sustain an

11

ordinary routine without special supervision; ability to work in coordination with or proximity to others without being distracted by them; ability to interact appropriately with the general public; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; ability to respond appropriately to changes in the work setting; ability to be aware of normal hazards and take appropriate precautions; ability to travel in unfamiliar places or use public transportation; and ability to set realistic goals or make plans independently of others. (Tr. 247-48).

The ALJ gave Dr. Chambers' opinion "diminished weight", stating it was not fully supported and was not consistent with the medical evidence as a whole. (Tr. 20). His further explanation of the basis for rejecting the opinion of this treating physician included (1) Dr. Chambers had only seen Claimant two times the year the medical source statement was authored; (2) Dr. Chambers prescribed "exorbitant amounts of drugs" while Claimant was exhibiting drug seeking behavior by obtaining prescriptions from multiple doctors; (3) Dr. Chambers' treatment notes indicate Claimant was "able to focus and get some things done"; (4) Claimant kept her appointments with Dr. Chambers despite his findings of

12

functional limitations in this area; (5) Dr. Chambers did not treat Claimant in a group setting and Claimant did not exhibit behavioral extremes in Dr. Chambers' presence; (6) Claimant could drive to her appointments and Dr. Chambers did not advise her not to drive long distances; and (7) Dr. Chambers "apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant and uncritically seemed to accept" her statements as true when cause existed to question them. (Tr. 21).

The bases offered by the ALJ for rejecting Dr. Chambers findings and concluding Claimant had medically improved to justify a termination of benefits are tenuous and unsupported by substantial evidence. The fact Dr. Chambers attended Claimant twice in the year before proffering the medical source statement is explained by Claimant's sporadic transportation difficulties and is belied by the extensive medical history between this physician and Claimant. (Tr. 264, 271). The drug seeking behavior which the ALJ diagnosed and the multiple sources she allegedly sought for these drugs consists of Dr. Willis, who Claimant saw when Dr. Chambers was unavailable, and Dr. Chambers. Each physician was aware of the treatment and prescribing of medication of the other. While Dr. Willis was unwilling to regularly renew Dr. Chambers' prescriptions and expressed opinions that Claimant was taking a considerable

13

amount of medication, nothing in the record indicates Claimant was a "drug seeker" as concluded by the ALJ. The reference to Claimant's ability to focus is found in a single treatment note and was not contained in subsequent notes demonstrating the waxing and waning nature of Claimant's condition. The fact Claimant was able to make her appointments as scheduled should not be a basis for contesting Dr. Chambers functional findings. The ALJ's conclusion that Claimant did not exhibit behavior extremes in Dr. Chambers presence is, in itself, a subjective conclusion by the ALJ and without foundation in the record. The lack of a restriction on Claimant's driving ignores the nature of Claimant's conditions – not all mental conditions would preclude driving. Finally, the ALJ's conclusion that Dr. Chambers accepted Claimant's subjective statements uncritically does not take into account Dr. Chambers recorded observations of Claimant's conditions and represents a conclusion drawn by the ALJ without foundation.

In deciding how much weight to give the opinion of a treating physician, an ALJ must first determine whether the opinion is entitled to "controlling weight." Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003). An ALJ is required to give the opinion of a treating physician controlling weight if it is both: (1) "well-supported by medically acceptable clinical and laboratory

14

diagnostic techniques"; and (2) "consistent with other substantial evidence in the record." Id. (quotation omitted). "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." Id.

Even if a treating physician's opinion is not entitled to controlling weight, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527." Id. (quotation omitted). The factors reference in that section are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. Id. at 1300-01 (quotation omitted). After considering these factors, the ALJ must "give good reasons" for the weight he ultimately assigns the opinion. 20 C.F.R. § 404.1527(d)(2); Robinson v. Barnhart, 366 F.3d 1078, 1082 (10th Cir. 2004)(citations omitted). Any such findings must be

15

"sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and the reason for that weight." Id. "Finally, if the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so." Watkins, 350 F.3d at 1301 (quotations omitted).

While the ALJ states that he gave Dr. Chambers' opinion diminished weight, it is clear from the record that he gave it no weight. His bases for doing so is lacking and on remand, he shall re-evaluate Dr. Chambers' opinion.

It is also unclear from the decision what evidence upon which the ALJ relied to find medical improvement. Other than declining to accept Dr. Chambers' findings and reciting Claimant's testimony, he does not expressly set forth the basis for his conclusion of medical improvement. Moreover, the ALJ found Claimant improved as of November 2, 2011. The only reference to this date in the medical record is a conclusion by the state agency that Claimant's benefits should terminate on that date "[s]ince the claimant and/or the the (sic) claimant's payee has/have failed to provide needed information . . . ." (Tr. 83). The explanation for failing to respond to the Social Security Administration's inquiry has not been challenged - that Claimant's ex-husband did not provide the

16

notifications mailed to his address to Claimant. No medical evidence has been cited by the ALJ to warrant an adoption of this apparently arbitrary date. On remand, the ALJ shall re-examine this finding and provide evidentiary support for any such conclusion.[2]

## Conclusion

The decision of the Commissioner is not supported by substantial evidence and the correct legal standards were not applied. Therefore, the Magistrate Judge recommends for the above and foregoing reasons, the ruling of the Commissioner of Social Security Administration should be **REVERSED and the matter REMANDED** for further proceedings consistent with this Order. The parties are herewith given fourteen (14) days from the date of the service of these Report and Recommendation to file with the Clerk of the court any objections, with supporting brief. Failure to object to the Report and Recommendation within fourteen (14) days will preclude appellate review of this decision by the District Court based on such findings.

---

[2] The ALJ also references something called a "comparison point decision" in his decision, even abbreviating it as "CPD" throughout. While it appears the ALJ uses this as a term of art in Social Security law, this Court has not located any relevant case or regulatory authority which utilizes this term.

DATED this 22nd day of July, 2016.

                                                                    _____
                                                                    KIMBERLY E. WEST
                                                                    UNITED STATES MAGISTRATE JUDGE